**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**CINQUAN CARTLEDGE**<br><br>**Defendants.** | **Case No. 1:26-mj-112-1-MAU** |

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION FOR DEFENDANT CINQUAN CARTLEDGE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion for detention pending trial under 18 U.S.C.§ 3142(f)(1)(E) (felony involving possession of a firearm) and.§ 3142(f)(1)(D). Cinquan Cartledge (the "Defendant") is charged with two counts in violation of 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm) and 22 D.C. Code § 2801, 4502 (Robbery while Armed).

## I.     INTRODUCTION

The Defendant and his partner in crime, Suspect 1, committed a brazen armed robbery in broad daylight while brandishing a firearm. During the robbery, he pointed the gun toward the victim and his wife and threatened to shoot her. The couple's child watched the terrifying encounter.

After completing the robbery, the Defendant and Suspect 1 fled the scene in a car. Law enforcement maintained surveillance of the vehicle, following it into the parking lot of the Vista Apartments in Southeast D.C. There, the Defendant and Suspect 1 abandoned the vehicle and fled

from police on foot.

While attempting to evade capture, the Defendant discarded his firearm—a Glock with an extended ammunition clip and machine gun conversion device—throwing it near the feet of a child who was standing by a playground. After recklessly abandoning a fully loaded, illegally modified firearm in a public area, the Defendant initially succeeded in escaping from law enforcement.

But, the Defendant could not hide for long. While Metropolitan Police Department ("MPD") officers were still on scene at the Vista Apartments searching for the Defendant, they were approached by a resident who advised the officers that a man had entered their apartment and was holding their two children—a minor and a special needs adult—against their will. MPD officers immediately entered the apartment, located the Defendant hiding in the bedroom of the special needs person and took him into custody.

The Defendant's criminal conduct is extraordinarily dangerous. After committing an armed robbery while carrying a fully loaded, illegally modified firearm, he fled from law enforcement, invaded an occupied residence, and terrorized a family by holding two vulnerable individuals against their will. And he committed this crime while on supervised release, demonstrating that prior supervision has done nothing to deter his criminal conduct. His lengthy violent criminal history, including a prior conviction for stabbing someone and a murder charge that resulted in a guilty plea to unlawful possession of a firearm, establishes that he poses a grave and continuing danger to the community. The factors set forth in 18 U.S.C. § 3142(g) factors overwhelmingly support detention, and no combination of conditions can reasonably assure the safety of any other person or the community.

## II.    PROCEDURAL HISTORY

On July 13, 2026, United States Magistrate Judge Moxila A. Upadhyaya signed a

complaint, charging the Defendant with Possession of a Firearm and Ammunition by a Person Convicted of an Offense Punishable by a Term of Imprisonment Exceeding One Year, in violation of 18 U.S.C. § 922(g), and Robbery While Armed in violation of 22 D.C. Code § 2801, 4502. The defendant made his initial appearance before Magistrate Judge Upadhyaya on July 14, 2026. At that hearing, the government moved for detention pursuant to 18 U.S.C. § 3142(f)(1)(E).

## III.   STATEMENT OF FACTS

### A.  The Defendant and Suspect 1 Assaulted and Robbed Victim 1 With a Firearm.

On Thursday, June 11, 2026, at approximately 6:43 pm, members of the Metropolitan Police Department ("MPD") responded to a robbery call at 4321 Nannie Helen Burroughs Avenue Northeast, Washington, D.C. 20019. Upon arrival, officers met with the victim of the armed robbery ("Victim 1").[1]

Victim 1 reported that he was walking from his home to Menick's Market, located at 4401 Nannie Helen Burroughs Avenue Northeast to pick up supplies for a birthday party he had planned for his wife the next day. Between Victim 1's residence and Menick's Market is a liquor store with an adjacent parking lot. While walking to Menick's Market, Victim 1 observed a white Dodge Charger ("Suspect Vehicle") in the liquor store parking lot near 4347 Hunt Place Northeast. Victim 1 observed Suspect 1  in front of the liquor store parking lot. As Victim 1 approached the liquor store, Suspect 1 approached him and asked if he could provide change for a $100 bill. Victim 1 agreed.

---

[1] Although Victim 1 was born a female and records may reflect that, Victim 1 identifies as a male. Currently, there is no evidence the Defendant targeted Victim 1 for his gender or sexuality.



*Suspect 1 in Front of the Liquor Store at 18:22:22 Hours.*



*Suspect 1 and Victim 1, Who is Wearing a White Tank Top, in Front of the Liquor store.*

After Suspect 1 handed Victim 1 the cash he was supposed to exchange, Victim 1 realized the cash was fake. Victim 1 handed Suspect 1 the cash back and attempted to walk away from Suspect 1. However, Suspect 1 grabbed him from behind and placed him into a headlock. Victim 1 resisted Suspect 1 and fought back.

A second surveillance camera from the liquor store, oriented towards its parking lot, partially captured the offense. At approximately 18:28:11, the Defendant emerged from the Suspect Vehicle to assist Suspect 1 because Suspect 1 struggled to rob Victim 1. The Defendant ran towards Suspect 1 and Victim 1, who were fighting on the ground at this point.





*Surveillance video of the Defendant exiting the Suspect Vehicle and assisting Suspect 1*



*Surveillance Video of the Defendant Assisting Suspect 1 with the Robbery.*

As Victim 1 was being robbed, his wife ("Victim 2") was outside of their home with Victim 1's child ("Child 1"). Child 1 was playing and roller skating outside the home. During the robbery, Victim 1 yelled for Victim 2. After hearing her husband scream for help, Victim 2 sprinted to assist him. Victim 2 ran directly at Suspect 1 who attempted to strike Victim 2. At this point, whether it is because the Defendant understood that him and Suspect 1 were losing the physical altercation or otherwise, he returned to the Suspect Vehicle, retrieved his gun, and pointed a black Glock handgun with an extended magazine at Victim 2 and threatened to shoot her.



***Suspect 1 attempting to strike Victim 2. The Defendant is in the Driver's Seat of the white Dodge Charger, Pointing a Firearm (circled in red) Towards Victims 1 and 2.***

After seeing the Defendant with the firearm and hearing him threaten to shoot Victim 2, both Victims were able to disengage from the altercation and flee from the parking lot to their home where they called 911. Shortly thereafter, at approximately 18:28:49, Suspect 1 entered the front passenger seat of the Suspect Vehicle with the Defendant driving the vehicle and they drove away.

6

Victim 1 sustained a minor laceration to his right cheekbone and minor scratches to his hands because of the robbery. Victim 1 reported that his iPhone 16E was stolen during the robbery. He estimated the value to be $1,100 and provided officers with the associated phone number. Victim 1 stated that he did not know whether it was Suspect 1 or the Defendant that stole his iPhone.

During the altercation, Suspect 1 dropped his own cellphone with his Washington, D.C. identification card in the phone case. Victim 1 provided Suspect 1's phone to law enforcement.



*Suspect 1's Cell Phone with Identification Card in Case.*



***Suspect 1's Identification Card***

### B.  Law Enforcement Tracked the Defendant and Suspect 1 to the Vista Apartments

Law enforcement maintained surveillance of the Suspect Vehicle from the time it left the liquor store parking lot. Victim 1 provided a description of the Suspect Vehicle and its license plate. He described the Suspect Vehicle as a white Dodge Charger with a Virginia license plate number TWV1692. Law enforcement queried the license plate number as described by Victim 1 and determined that license plate was registered to a Subaru, which did not match the appearance or description of the Suspect Vehicle. However, law enforcement then conducted an inquiry using the FLOCK law enforcement database and determined the correct plate to be Virginia tag TWZ1692, registered to a white Dodge Charger owned by the Defendant.

Victim 1 also provided law enforcement with live tracking updates of his phone's location using the "Find My" iPhone application from a relative's device. Law enforcement tracked Victim 1's phone to D.C. Highway 295 until the signal was lost. However, law enforcement was able to respond to D.C. Highway 295 and tail the Suspect Vehicle.

Importantly, Victim 1 reported that while the Defendant and Suspect 1 were in possession of his phone, Victim 1's cousin called his phone, and the Defendant and Suspect 1 answered.

8

Victim 1 reported that the Defendant and Suspect 1 told his cousin that they would find him and kill him.

At approximately 18:51:49, law enforcement observed the Suspect Vehicle traveling on Suitland Parkway Southeast. Law enforcement subsequently observed the Suspect Vehicle in the turn lane from Suitland Parkway Southeast towards Firth Sterling Drive Southeast.



***Suspects traveled from 295 to Suitland Parkway to Sheridan Road to Pomeroy Road before turning into an apartment building parking lot in the 2500 block of Pomeroy Road Southeast.***

Law enforcement maintained continuous surveillance of the Suspect Vehicle, and at approximately 18:55:41, observed the Suspect Vehicle turn on Sheridan Road Southeast. At approximately 18:56:25, law enforcement observed the Suspect Vehicle pull into the Vista Apartment building parking lot at 2500 Pomeroy Road and drive down the one-way parking lot. Law enforcement then activated their emergency equipment.

### C.  The Defendant and Suspect 1 Fled from Police

Upon realizing law enforcement followed them into a parking lot, the Defendant and Suspect 1 immediately exited the Suspect Vehicle and fled on foot. As the Defendant bailed out of the Suspect Vehicle, he dropped his cellphone near the driver's side door of the Suspect Vehicle.



*The Suspect Vehicle abandoned.*

At approximately 18:56, law enforcement pursued the Defendant and Suspect 1 through the parking lot of the 2500 block of Pomeroy Road Southeast, towards the playground at the furthest end of it. The Suspects then split up and fled separately. Law enforcement observed that the Defendant was reaching towards his waistband as he fled from law enforcement. Importantly, the Defendant and Suspect 1's flight path cut between a playground and a basketball court. There were people playing basketball as they fled, and a child was mere feet from where the Defendant discarded his firearm.



10

*As observed on MPD Officer Koksaldi's bodycam, Suspect 1 and the Defendant fled from police. The firearm the Defendant pointed at Victims 1 and 2 was discarded next to a child.*



*The red circle is approximately where the Suspect Vehicle was abandoned and the red arrows indicate the path the suspects fled—between a playground and basketball court.*

Unfortunately, law enforcement was unable to apprehend either Suspect. However, they did recover the Defendant's firearm. The recovered firearm was a black Glock firearm with an extended magazine and it was processed by Department of Forensic Sciences Crime Scene Officer Brokaw. The firearm is a .40 caliber Glock Model 22, bearing serial number BHER609. The firearm was loaded with one (1) cartridge of ammunition in the chamber of the weapon and a further twenty-one cartridges of ammunition in the magazine of the weapon; which is a large capacity feeding device as it contains greater than ten cartridges of ammunition. The firearm was also affixed with an aftermarket Machine Gun Conversion Device ("MCD"), commonly referred to as a "switch," which allows the firearm to fire automatic, without interruption, as opposed to semiautomatic as manufactured from the factory.

11



*Firearm Recovered in the Defendant's flight path.*

Additionally, at approximately 19:05:19 Victim 1's cellphone was recovered behind the apartment buildings near 2540 Elvans Road Southeast, Washington, D.C. 20020 in the flight path of one of the suspects.

### D.  MPD Apprehended the Defendant in a Special Needs Person's Bedroom.

The Defendant could not hide from law enforcement for long. Law enforcement remained near the Vista Apartments around the 2500 blocks of Pomeroy Road Southeast and Elvans Road Southeast, looking for the Defendant and Suspect 1.

At approximately 19:45:40, the leaseholder of an apartment (referred to as "Witness 1") advised MPD Detective Shoemaker that its 15-year old child (referred to as "Witness 2") texted it to report that a shirtless, unknown man broke into their apartment.



***Text from Witness 2 to Witness 1 Reporting The Defendant in Their Apartment***

Witness 1 told law enforcement that its two children were in the apartment and gave law enforcement consent to enter its apartment to conduct a welfare check. Witness 1 told law enforcement that her other child has severe autism and was also in the apartment (referred to as "Witness 3").

At approximately 20:00:00, law enforcement forcibly entered Witness 1's apartment. Law enforcement safely recovered Witness 1's two children. Witness 3 emerged from its bedroom and law enforcement safely recovered it. Moments later, a shirtless Defendant emerged from the same bedroom. MPD immediately detained the Defendant.

13



*The Defendant apprehended outside of Witness 1's apartment*

Witness 2 and 3 were traumatized by the Defendant breaking into their apartment. Witness 2 told law enforcement that it left its room to go to the living room area of the apartment and saw the Defendant in Witness 3's bedroom with Witness 3. In response, Witness 2 hid in their closet and contacted their mother. Witness 2 was visibly shaken by the Defendant's actions. Witness 3 reported that it was in its room when a shirtless Defendant entered its room and demanded it be quiet and stay in its room with him. Witness 3 also was traumatized by the Defendant's actions. Neither Witness 2 nor Witness 3 knew the Defendant and certainly did not give him permission to enter the apartment.

### E.  Search Warrant Returns Corroborate Witness Testimony.

On June 29, 2026, Magistrate Judge Faruqui signed a search warrant for the Defendant and Suspect 1's phones. The Defendant and Suspect 1's texts were recovered on the Defendant's phone. As reflected below, shortly before the robbery, at 3:20 pm on June 11, Suspect 1 texted the Defendant "Da Move Ready Bruh." And at 6:24 pm, approximately two minutes before Suspect 1 is seen interacting with Victim 1 on surveillance camera, Suspect 1 texted the Defendant "On Nutz I Should Get Da Jaint." Law Enforcement advised that a "move" is a term for a robbery and that the term "Jaint" is a likely misspelling of a "Joint," which is commonly used as a slang term for a

firearm. So, the Defendant and Suspect 1 were ready to commit a robbery, and two minutes before

the robbery, Suspect 1 said he should get the gun.





The Defendant's phone also contained a photo of a firearm with an extended magazine.



15

Further, law enforcement also searched the Defendant's vehicle pursuant to a search warrant. Consistent with Victim 1's belief that the cash Suspect 1 handed him felt counterfeit, law enforcement recovered three $100 counterfeit bills from the Defendant's vehicle.



Further, law enforcement also recovered a spent .38 special shell casing, which means at some point, the Defendant fired a weapon and the shell casing remained in the vehicle.

The facts of the Defendant's crime are abhorrent and the evidence is overwhelming. Applying these facts to the law, it is clear the Defendant should be detained pre-trial.

## IV.    LEGAL AUTHORITY

As a preliminary matter, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted, and the government may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *see also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues, since the detention hearing is not to be turned into a mini-

trial and is not to be used as a subterfuge to obtain discovery. *See Smith*, 79 F.3d at 1210; *Williams*, 798 F. Supp. at 36.

Under the Bail Reform Act, if a court determines that "no condition or combination of conditions will reasonably assure the appearance of [a defendant] as required and the safety of any other person and the community," a court shall order a defendant held pending trial. 18 U.S.C. § 3142(e).

In this case, the United States seeks detention pursuant to 18 U.S.C. § 3142(f)(1)(E) (felony involving possession of a firearm) and 18 U.S.C. § 3142(d)(1)(A)(iii) (Defendant on probation or parole). The standard of review under § 3142(f)(1)(E) is clear and convincing evidence. Here, (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release, all weigh heavily in favor of detaining the Defendant pre-trial. 18 U.S.C. § 3142(g).

## I.    ARGUMENT

This is not a routine felon-in-possession case. It is a violent armed robbery case in which the Defendant used a loaded, illegally modified firearm to terrorize multiple victims, endangered several children, fled from law enforcement, and then barricaded himself inside an occupied apartment after taking vulnerable residents against their will. During the armed robbery, the Defendant threatened to shoot a victim while the victim's young child watched in fear. As the Defendant fled law enforcement, he discarded his loaded firearm right near another child's feet creating yet another grave risk of death of death or serious bodily injury. The Defendant then broke into an apartment occupied by a child and special needs person. Shirtless and sweating, the Defendant held the special needs person in their home against their will. Fortunately, MPD entered

17

the apartment and detained the Defendant before he could inflict any further harm on them. The Defendant committed these offenses while on supervised release, demonstrating that court supervision has failed to deter his escalating criminal conduct. Under these circumstances, each of the four factors under § 3142(g) all overwhelmingly weigh in favor of detention.

### A.     The Nature and Circumstances of this Offense Merits Detention.

The nature and circumstances of the Defendant's offenses favor detention. This case involved not only the unlawful possession of a loaded, illegally modified firearm, but also its use during a violent armed robbery, threats to kill a victim, reckless conduct that endangered multiple children, and the defendant's subsequent invasion of an occupied apartment while attempting to evade law enforcement. The offenses also targeted particularly vulnerable victims, including a child and a special needs adult. Finally, the Defendant compounded the danger by discarding his loaded firearm near a playground while fleeing police, creating an obvious risk that an innocent bystander—particularly a child—could have discovered the weapon. These circumstances demonstrate the Defendant's violent character and reckless conduct that strongly supports detention.

### 1.   Cartledge Committed a Violent Offense Involving a Firearm.

In broad daylight, the Defendant committed a violent armed robbery while carrying a loaded, illegally modified firearm, which he used to threaten his victims and facilitate the offense. Section 3142(g)(1) specifically directs the Court to consider "whether the offense is a crime of violence . . . or involves a . . . firearm." Both considerations strongly support detention. And this factor weighs heavily in favor of detention.

An armed robbery is an extremely dangerous offense because even under the best circumstances, victims are placed at immediate risk of death or serious bodily injury. That danger

18

was fully realized here. The Defendant physically assaulted one victim, threatened to shoot another, committed the robbery in the presence of a child, fled from law enforcement, discarded a loaded, illegally modified firearm near a playground, and ultimately invaded an occupied apartment where he held a child and a special-needs adult against their will. Far from an ordinary firearms offense, the Defendant's conduct reflects a continuous escalation of violence that endangered numerous innocent victims and demonstrates that he poses an extraordinary danger to the community.

The firearm was central to the defendant's criminal conduct. He used it to facilitate an armed robbery, threatened to shoot a victim with it, carried it while fleeing law enforcement, and ultimately discarded the loaded, illegally modified firearm in a pubic area near a playground. That reckless act endangered every member of the public who could have encountered the weapon, particularly children. Mere unlawful possession of a firearm "presents a serious danger to the community." *See United States v. Taylor*, 289 F. Supp. 3d 55, 64 (D.D.C. 2018) (holding the possession of multiple illegal guns poses a threat to the community); *United States v. Washington*, 907 F. Supp. 476, 486 (D.D.C. 1995) ("[P]ossession by a felon of a fully loaded semi-automatic pistol suggests that the defendant presents an extreme safety risk to the public."). In this case, the Defendant's violent behavior involving the firearm the strongly favors detention.

### 2. **The Defendant Physically and Psychologically Harmed People.**

The Defendant inflicted both physical and psychological harm to some of the most vulnerable members of our society. Not only did the Defendant physically harm Victim 1 and threaten to kill Victim 2, but he also psychologically harmed two children and a special needs adult against that person's will while attempting to evade law enforcement. The profound impact of these offenses strongly supports detention.

19

The Defendant physically assaulted Victim 1 by violently holding him down while robbing him. Although Victim 1 ultimately fought back that does not diminish the violent nature of the defendant's contact or the danger he posed throughout the encounter. After Victim 1 gained the upper hand over Suspect 1, the Defendant joined the struggle, physically restraining Victim 1, and effectuating the robbery. Together, the Defendant and Suspect 1 pinned Victim 1 down, searched his pockets, and stole his iPhone. When Victim 2 came to Victim 1's aid, the Defendant retrieved his firearm, pointed it directly at her and threatened to shoot her. Although Victim 1 escaped with relatively minor physical injuries and Victim 2 was not physically struck, the outcome resulted despite—not because of—the Defendant's conduct. Victim 2 reported that the robbery left her traumatized.

The Defendant also inflicted profound psychological trauma on multiple vulnerable victims, including two children and a special-needs adult. Those victims were exposed to threats of deadly violence, forced confinement, or both, while the Defendant attempted to evade law enforcement. The emotional trauma inflicted by those events further underscores the extraordinary danger posed by his conduct. Child 1 watched the Defendant beat and rob their father. As Victim 1 went to the store to pick up supplies for his wife's birthday party the next day, his child played on roller skates outside and witnessed the entire robbery. Although Child 1 was a very active kid who loved to play outside and sell water and snacks in the neighborhood, Child 1 has been afraid to leave the home after witnessing their father being robbed.

The psychological harm to Witness 2 and 3 is undeniable—the Defendant penetrated their sanctuary. Witness 2 and 3 will never forget when a shirtless, sweating man, broke into their home and forcibly held them against their will in their own bedrooms.

The Defendant assaulted vulnerable members of society all for his own gain. He assaulted

20

someone to rob and enrich himself. And he broke into a home and threatened a special needs person to evade police. These facts clearly support detention.

### 3.  The Defendant Discarded His Modified Firearm Near a Playground.

The Defendant modified his firearm to inflict maximum harm, but that did not stop him from discarding his firearm near the feet of a child as he fled from police. The Defendant's wanton disregard for human life—both by his possession of a modified firearm and by discarding the firearm near the feet of a child—demonstrate that the Defendant is a danger to the community.

The Defendant's firearm was equipped with two modifications that turned a standard firearm into a killing machine. First, the Defendant's firearm was equipped with a "switch." A "switch" is a small device attached to the rear slide of a Glock handgun that modifies the firearm to fire automatically. Colloquially, it turns a pistol into a machine gun. Second, the Defendant's firearm was equipped with an extended ammunition magazine. Instead of the standard 17 round ammunition capacity, the Defendant's firearm could carry 33 rounds of ammunition. Although the Defendant's firearm only had 21 rounds, with the two modifications, the Defendant could have emptied a 33-round clip in around 1.65 seconds.

The only reason a person would modify an illegal firearm with a switch and extended magazine is to inflict maximum pain.

And the Defendant was still willing to discard this killing machine at the feet of a child. As the Defendant fled, he threw the firearm on the ground right near a playground and basketball court. MPD Officers' body worn camera captured the moment right after the Defendant discarded the firearm and there clearly is a child standing right near the gun. Overall, the Defendant blatantly disregarded the value of all human life by possessing the firearm and then discarding it carelessly. These facts weigh heavily in favor of detention.

21

B.    **The Weight of the Evidence Favors Detention.**

The government's case against the Defendant is strong. It includes witness testimony, body worn camera, surveillance video, messages and images from the Defendant's cellphone, and physical evidence seized from his vehicle. The weight of the evidence clearly favors detention.

Courts routinely consider the strength of the government's case against a defendant when considering whether pretrial detention is appropriate. In *United States v. Blackson*, following a thorough review of the text of § 3142 and decisions analyzing this factor, Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." 2023 U.S. Dist. LEXIS 18988, at *29-30. Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate." *Id.* In an unpublished opinion, the D.C. Circuit affirmed Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). The Second Circuit reached the same conclusion. *United States v. Zhe Zhang*, 55 F.4th 141, 149-150 (2d Cir. 2022). Indeed, "if the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true." *Blackson*, 2023 U.S. Dist. LEXIS 18988, at *29-30.

Here, Victim 1 and 2's harrowing and detailed account of the Defendant's armed robbery is corroborated by the evidence in this case. Victim 1 reported that the money he agreed to exchange for Suspect 1 felt fake: Counterfeit money was found in the Defendant's vehicle. When Victim 1 saw a photograph of the firearm that was recovered in the Defendant's flight path, he

immediately identified it as the gun the Defendant pointed at his wife.

On the Defendant's cell phone, his text messages with Suspect 1—minutes before Suspect 1 initiated the robbery—demonstrate that Suspect 1 knew the Defendant possessed a firearm and Suspect 1 wished he had brought it with him to do the premeditated robbery or "move." There were also images of other firearms on the Defendant's device.

Moreover, most of the armed robbery was captured on surveillance video. There is further body worn camera video that captures the Defendant's flight, including moments after he discards the firearm identified by Victim 1. Body worn camera also captures the moment that the Defendant is removed from Witness 3's bedroom.

The weight and strength of the evidence increases the prospect that the Defendant will flee if released or attempt to further harm Victims of the crime. Accordingly, the second factor favors detention.

### 3.  The Defendant's History and Characteristics also Favor Detention.

The third factor—the history and characteristics of the defendant—heavily favors detention. The Defendant has a history of criminality and of noncompliance with his conditions of release. Indeed, he committed this crime while on probation. Most disturbing, however, is the Defendant's long history of violence. The Defendant was previously charged with murder. While he was incarcerated pending trial for the murder, he stabbed a fellow inmate numerous times. The Defendant's actions while incarcerated and on supervised release demonstrate that despite any conditions a court imposes upon him, he will continue his violent criminal conduct. If the Defendant is released, he will immediately return to his violent ways, just as he has always done. The Defendant's criminal history includes:

23

**1. Possession of Schedule I/II Controlled Substance (Stafford County, Virginia Case Number CR24000298-00)**

On November 11, 2023, the Defendant was convicted of possession of Schedule I/II Controlled Substance. He was sentenced to three years incarceration, with two years and nine months suspended and five years supervised release. He is currently on supervised probation.

**2. Theft under $25,000 (Calvert County, Maryland Case Number D-041-Cr-22-001150)**

On September 26, 2022, in Calvert County, Maryland, The Defendant was convicted of theft under $25,000. The Defendant was sentenced to five years incarceration with five years suspended and two years supervised probation.

**3. Forgery of Bank Coins and Notes (Stafford County, Virginia Case Number CR23000479-01)**

On March 25, 2024, in Stafford County, Virginia, the Defendant was convicted in Case Number CR23000479-01 of forging bank coins and notes. The Defendant was sentenced to five years incarceration with four years and six months suspended and five years supervised probation.

**4. Attempted Assault with a Dangerous Weapon (Washington, D.C. Case Number 2018-CF3-011250)**

On July 27, 2018, in Washington, D.C., the Defendant pleaded guilty to assault with a dangerous weapon in Case Number 2018-CF3-011250. While incarcerated in the D.C. jail, the Defendant stabbed another inmate multiple times. The Defendant stabbed the other inmate in the arm, chest, and head. The other inmate recovered. However, video captured the Defendant watching the victim for over a minute before running up to him and violently stabbing him. This stabbing took place while the Defendant was incarcerated pending trial for case number 2017-

24

CF1-007979. The Defendant was sentenced to 24 months incarceration and three years' supervised release.

### 5. Unlawful Possession of a Firearm (Washington, D.C. Case Number 2017-CF1-007979)

On May 8, 2017, in Washington, D.C., the Defendant pleaded guilty to unlawful possession of a firearm in Case Number 2017-CF1-007979. Initially, the Defendant was charged with Murder while Armed while Committing a Robbery, Murder while Armed, Conspiracy to Commit Armed Robbery, Armed Robbery, Possession of a firearm during a crime of violence, and Unlawful Possession of a Firearm. Before trial, the Defendant pleaded guilty to the lesser offense of unlawful possession of a firearm. The Defendant was sentenced to 36 months incarceration and three years supervised release.

Despite multiple prior terms of incarceration and repeated opportunities for pre-trial release, the Defendant consistently has demonstrated an unwillingness to conform his conduct to the law. His criminal history reflects not isolated lapses in judgment, but a sustained and violent pattern of criminal behavior that continued even after prior convictions, probationary terms, and court ordered supervision. Unlike defendants who had minimal criminal history, strong community ties, or demonstrated compliance with court directives, the Defendant has repeatedly violated conditions of release, failed to appear, and engaged in new criminal conduct while under supervision. This latest offense is a prime example.

Moreover, the Defendant's criminal history is violent. Although he was not convicted, he previously has been charged with murder. While incarcerated pending trial on the murder charges, he stabbed an inmate in hail and pleaded guilty to doing so. He is a violent criminal whose behavior has not changed despite prior convictions and stints of incarceration.

The Defendant's record shows that he neither respects court-imposed conditions nor can

be trusted to abide by them if released. His repeated failures under all forms of supervision establish that no combination of release conditions will reasonably assure the safety of the community. The entire community is at risk when the Defendant is not incarcerated.

Accordingly, the third factor weighs heavily in favor of continued detention. *See United States v. Munchel*, 991 F.3d 1273, 1281 (D.C. Cir. 2021) (concluding that courts can and should "consider whether it believes the defendant will actually abide by its conditions when making the release determination"); *see, e.g., United States v. Glasgow*, No. 1:20-cr-27-7 (KBJ), 2021 U.S. Dist. LEXIS 109972, at *37 (D.D.C. June 11, 2021) ("Because Glasgow has previously disobeyed a court-ordered condition of pre-trial supervision, the Court has little faith that he would not do so again if released pending trial.").

### C.    The Defendant Presents a Danger to Our Community.

The Defendant poses a clear and continuing danger to the safety of the community. The evidence in this case demonstrates a willingness to engage in violence through the use of firearms, intimidation, and threats of future harm, which is consistent of his prior conviction for brutally stabbing someone.

During the charged robbery, the Defendant physically assaulted Victim 1 and then threatened to shoot Victim 2 with a firearm to facilitate the offense and maintain control over his victims. Even more troubling, the Defendant's dangerousness did not end when the robbery was complete. Shortly after the offense, the Defendant and Suspect 1 spoke to Victim 1's cousin and threatened to kill Victim 1. Victim 1's cousin, who lives out of state and did not know Victim 1 had been robbed of his phone, called his phone shortly after the robbery. The Defendant and Suspect 1 answered. During the call, Victim 1's cousin reported to him that the Defendant and Suspect 1 told him that they would return to Victim 1's home and kill him. Those threats

demonstrate a continuing willingness to intimidate, silence, and terrorize those connected to his offense.

To be sure, the Defendant is not a first-time offender, and he committed this offense while on supervised release. The Defendant's long criminal history makes clear that if he is released, he will continue to engage in criminal misconduct. Moreover, the Defendant ignores any release conditions courts place upon him. The Defendant illegally possessed a handgun and committed an armed robbery *despite the fact* that he was on release conditions. The Defendant's actions have demonstrated that he does not respect the law or anyone in society, and he poses a serious and continuing threat to the community. The Defendant acts as though he is above the law and the authority of the Court. But he is not. Accordingly, there are no release conditions that can control the Defendant. The fourth detention factor weighs overwhelmingly in favor of continued detention.

## CONCLUSION

The government respectfully requests that the Court issue an Order granting its motion that the defendant be held without bond pending trial.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

/s/ *Samuel M. Deau*
SAMUEL M. DEAU
Assistant United States Attorney
DC Bar No. 90042268
601 D Street NW
Washington, D.C. 20530
Phone: 202-803-1643
samuel.deau@usdoj.gov